**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jennifer Houseman Corbett, individually and on behalf of all others similarly situated,<br>Plaintiff, | 1:21-cv-00996 |
| - against - | Class Action Complaint |
| Walmart Inc.,<br>Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Walmart Inc. ("Defendant" or "Walmart") is an American multinational retail company, founded in 1962.

2. Walmart operates pharmacies in almost all its 5,000 stores, in all 50 states, as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

3. If Walmart's pharmacy division were a standalone company, it would be the third-largest in the country behind CVS and Walgreens.

4. In addition to its pharmacy, Defendant markets, advertises, distributes, and sells various types of cosmetic and personal care products, including talcum powder.

5. These products include those marketed under Defendant's private label ("store brand") or from national brands.

6. For decades, Defendant sold Johnson & Johnson's Baby Powder (the "Product").



## I.     TALC, ASBESTOS AND HARM

7. Talcum powder is made from talc, a mineral mainly of magnesium, silicon, and oxygen.

8. Talc absorbs moisture and reduce friction, making it useful for keeping skin dry and preventing rashes.

9. As a result, it is used in cosmetic products such as the baby powder Product.

10. However, talc is often extracted from mines that also contain asbestos ore, making it extremely difficult to produce a pure compound.

11. During the past 40 years, scores of medical and scientific studies have shown that long-term use of talcum powder for feminine hygiene increases the risk of ovarian cancer.

12. The studies showed that when used in the genital area, talc can travel into the ovaries

and cause chronic inflammation, which has long been associated with cancer development. [1]

13. An article published in Cancer Preventative Research indicated the subject women had a 20-30% increased risk of ovarian cancer.[2]

14. The International Agency for Research on Cancer ("IARC"), part of the World Health Organization ("WHO"), classifies the perineal (genital) use of talc-based powder as "possibly carcinogenic to humans."

15. In 1976, the Cosmetic, Toiletry, and Fragrances Association ("CTFA"), the trade association representing the cosmetic and personal care products industry, issued voluntary guidelines requiring all talc used in cosmetic products in the United States should be free from detectable amounts of asbestos.[3]

16. Additionally, talc occurs together with asbestos in the earth, and mined talc has been shown to be contaminated with asbestos.

17. Asbestos is a highly toxic carcinogen that causes mesothelioma. a cancer that strikes the lungs and other organs

18. Asbestos was first linked to ovarian cancer in 1958.[4]

19. Asbestos exposure has also been linked to other cancers including but not limited to throat, kidney, brain, bladder, voice box, gastrointestinal tract, and gallbladder.

20. The World Health Organization and other authorities recognize No Safe Level of

---

[1] DrugWatch, Does Talc Cause Cancer?.

[2] Terry KL, Karageorgi S, Shvetsov YB, Merritt MA, Lurie G, Thompson PJ, Carney ME, Weber RP, Akushevich L, Lo-Ciganic WH, Cushing-Haugen K, Sieh W, Moysich K, Doherty JA, Nagle CM, Berchuck A, Pearce CL, Pike M, Ness RB, Webb PM; Australian Cancer Study (Ovarian Cancer); Australian Ovarian Cancer Study Group, Rossing MA, Schildkraut J, Risch H, Goodman MT; Ovarian Cancer Association Consortium. *Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls*. Cancer Prev Res (Phila). 2013 Aug;6(8):811-21. doi: 10.1158/1940-6207.CAPR-13-0037. Epub 2013 Jun 12. PMID: 23761272; PMCID: PMC3766843.

[3] Talcum Powder and Cancer, Cancer.org.

[4] Tiffany Hsu and Roni Caryn Rabin, Johnson and Johnson to End Talc-Based Baby Powder Sales in North America, New York Times, May 19, 2021.

exposure to asbestos.

## II. DEFENDANT WAS AWARE OF DANGEROUS PRODUCT

21. Internal memos and reports uncovered during the thousands of lawsuits against Johnson & Johnson ("J&J" or the "manufacturer") by cancer victims revealed the company had been concerned for at least 50 years about traces of asbestos in its talc, and that talcum powder could cause or increase the risk of cancer.

22. A 2018 Reuters article demonstrated that J&J has known since 1971 that the talc used in its powder could contain asbestos, as it repeatedly found trace amounts of asbestos contamination in the Product. [5]

23. Despite these risks, talc continued to be used in items such as the baby powder Product at issue here because it is a super-absorbent material.

24. J&J has faced over 19,000 lawsuits alleging its talcum powder caused ovarian cancer and/or mesothelioma, a cancer that strikes the lungs and other organs.

25. Though many cases are on appeal, billions of dollars have been awarded to victims for damages caused by the talcum powder products.

26. Due to the overwhelming number of cancer claims and lost legal battles, J&J stopped selling the Product in the United States and Canada in May 2020.

27. Stores around the country such as Defendant, however, continued to sell remaining inventory of the Product, notwithstanding the manufacturer's decision to remove it from stores.[6]

[5] Reuters Investigates, Johnson and Johnson knew for decades that asbestos lurked in baby powder, Dec. 14, 2018; Clarrie Feinstein, Johnson & Johnson recalled a batch of baby powder after a test found asbestos. The company says the product is safe, Business Insider, Oct. 29, 2019.

[6] Vanessa Romo, Johnson & Johnson Stops Selling Talc-Based Baby Powder In U.S. And Canada, NPR.org, May 19, 2020.

## III. DEFENDANT FAILED TO WARN CUSTOMERS OF PRODUCT'S DANGER AND RISKS OF USE

28. Despite the wealth of scientific research revealing the carcinogenic effects of asbestos and thousands of lawsuits against the Product's manufacturer elucidating its hazards, Defendant continued to market the Product as safe for consumer use.

29. Defendant provided no warning or disclaimer that the Product had been shown to contain asbestos and posed severe health and carcinogenic risks.

30. Through a variety of advertising methods and omissions, Defendant made false representations regarding the true nature of the Product.

31. Defendant promotes itself as a leader in "Health & Wellness," stating that its "mission [is] to help our customers live better, healthier lives.

32. Defendant is trusted by its customers with their health, which is the result of its relentless expansion into this sector.

33. In 2014, Defendant, with the help of PriceWaterhouseCoopers ("PwC"), sought to

create a "one-stop-shop, retail health destination."

34. The result was the "Healthcare Begins Here" campaign, targeted at "assisting consumers with making smarter decisions on everyday health and wellness needs for themselves and their families."

35. In its efforts to promote the health and wellness of its customers, Defendant promised that its stores would not sell or promote products which are detrimental to their health and wellness.

36. As a result, Plaintiff purchased a Product that was unreasonably dangerous and not as represented by Defendant.

37. Plaintiff and consumers expected to purchase a safe cosmetic product only to learn that they were purchasing a dangerous product which could, and often did, cause cancer.

38. As a result, plaintiff and consumers were denied the benefit of their bargain.

39. The Product was sold for a price premium compared to other similar products, no less than $3.99 for 15 OZ, a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

Jurisdiction and Venue

40. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

41. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

42. Plaintiff Jennifer Houseman Corbett is a citizen of New York.

43. Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Bentonville, Benton County, Arkansas

44. The parties are citizens of different states.

45. Venue is in this district because plaintiff resides in this district and the actions giving rise to the claims occurred within this district.

Parties

46. Plaintiff Jennifer Houseman Corbett is a citizen of Buffalo, Erie County, New York.

47. Defendant Walmart Inc., is a Delaware corporation with a principal place of business in Bentonville, Arkansas, Benton County.

48. Defendant is the largest company in the world by revenue, through its thousands of stores worldwide and in this country.

49. Defendant represents itself as "providing customers with high-quality health and wellness products and care."[7]

50. Defendant professed a commitment to "Supporting transparency and quality in the products [they] sell."[8]

51. Defendant professes to "value the trust of [their] customers," by raising their "awareness of product risks and by sourcing safe and affordable merchandise to help our customers save money and live better."

52. Defendant recognizes that its customers "want to know more about the food and other products they buy. Not only do they expect them to be safe, but also, they want to know how they were made, and with what ingredients and materials."

53. Defendant's Sustainable Chemistry Policy has made "Reducing chemicals of concern" a key priority, through its commitment to "Reduce, restrict and remove use of high-priority chemicals ('HPC') using informed substitution principles."[9]

---

[7] Global Compliance Program Report on Fiscal Year 2014.
[8] Supporting transparency and quality in the products we sell in 2016 Global Responsibility Report.
[9] *Id.* at 2.

54. Where HPCs cannot be substituted, Defendant has instructed its suppliers to reformulate their products.

55. When reformulation is not possible, Defendant can – and has – required such products be removed from its stores.

56. Defendant proudly acknowledges that merely because a product "compl[ies] with applicable safety laws and regulations," "existing laws and regulations are the minimum level of safety we require."

57. Defendant imposes "Walmart- and Sam's Club-specific requirements that exceed regulatory requirements" for product safety.

58. Defendant has participated in, and created, national consumer education campaigns about hazards lurking in everyday life.

59. For instance, the campaigns focused on "swimming pool safety, lead poison prevention and the Anchor It campaign to prevent furniture and television tip-over accidents."

60. At no point did Defendant initiate or develop a campaign to educate its customers about the harms of the J&J Baby Powder.

61. Defendant touted its "ability to identify and monitor supplier and product compliance and to hold suppliers accountable for adhering to our standards," which "gives [its] customers trust in the items we sell."

62. Defendant applied these principles to its sale of personal care products through its participation in the Beauty and Personal Care Initiative ("BPC"), which focused on sustainable and non-harmful product ingredients.

63. Through its monitoring of suppliers such as J&J, Defendant was or should have been aware of the link between J&J's Baby Powder and risk and development of cancer and

mesothelioma.

64. Defendant never applied its self-professed scrutiny of the products it sells to the J&J Baby Powder.

65. In purchasing the Product from her trusted Walmart, Plaintiff believed the that the Product was a safe cosmetic product when it was not because it has been shown to be carcinogenic and pose a severe health risk.

66. Defendant provided no warning or disclaimer regarding the inordinately harmful nature of the Product.

67. Defendant's advertising and marketing regarding concern for the health and wellness of its customers is deceptive because it failed to disclose the Product was – and is – inherently dangerous.

68. Plaintiff bought the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at defendant's stores in her area, including the location at 4975 Transit Rd, Depew, NY 14043, between 2016 and 2020, among other times.

69. Plaintiff would not have purchased the Product if she had known the true nature of its harmful effects.

70. In purchasing the Product, Plaintiff saw, read, and relied on the representations and omissions from Defendant that it was safe and suitable for hygiene, because it was sold by Defendant.

71. In purchasing the Product, Plaintiff saw, read, and relied on its labeling and advertising, in digital, print, and other media, which touted its safety.

72. Plaintiff was damaged by her purchase of the Product because the labeling and advertising for the Product was and is deceptive and misleading.

73. The Product was worth less than what Plaintiff paid for it, and Plaintiff did not receive what she reasonably expected to receive.

74. Defendant's failure to warn that the Product was unreasonably dangerous was important to Plaintiff in deciding to purchase and use the Product.

75. Plaintiff would not have purchased, at or exceeding the above-referenced price, had it been advertised and labeled with a warning of its significant health risks to consumers.

76. Defendant should have been prohibited from selling the Product long before it was removed from its stores by the manufacturer, because it posed a great health risk.

Class Allegations

77. Plaintiff seeks certification of claims and certain issues pursuant to the applicable provisions of Federal Rule of Civil Procedure 23 on behalf of the following individuals:

> All New York residents who purchased Johnson and Johnson's Baby Powder (the "Product") from any Walmart store within New York or ordered the Product for delivery into New York, during the statutes of limitations ("Class Period").
>
> Excluded from the Class are Defendant and any officer, director, employee, legal counsel, firm, trust, corporation, or other entity related to or affiliated with Defendant and the members of the judiciary and their office staff to whom this case may be assigned.

78. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

79. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

80. Plaintiff is an adequate representative because her interests do not conflict with other members.

81. No individual inquiry is necessary since the focus is only on defendant's practices

and the class is definable and ascertainable.

82. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

83. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

84. Plaintiff seeks class-wide injunctive relief because even though the Product is no longer sold, Defendant's customers are likely to still have the Product in their possession and use it.

85. Plaintiff seeks injunctive relief in the form of Defendant's disclosure to their customers that if they still possess the Product, they should discard it immediately.

New York General Business Law ("GBL") §§ 349 & 350

(Consumer Protection Statute)

86. Plaintiff incorporates by reference all preceding paragraphs.

87. Plaintiff and class members desired to purchase a safe and conventional cosmetic product, when in fact it was not because the Product has been shown to contain asbestos and therefore poses a severe health risk to consumers.

88. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

89. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

90. Plaintiff relied on the representations.

91. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

92. Plaintiff relied on the representations.

93. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

94. The Product was manufactured, labeled, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it was a safe cosmetic product, when it was not because it has been shown to be carcinogenic contaminated with asbestos and therefore poses an extremely dangerous health risk to consumers.

95. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

96. This duty is based on Defendant's outsized role in the market for this type of Product.

97. Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

98. Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices.

99. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because they were not fit to pass in the trade as advertised.

100. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

101. Defendant had a duty to truthfully represent the Product, which it breached.

102. This duty is based on defendant's position, holding itself out as having special

knowledge and experience in this area – a self-proclaimed trusted health and wellness provider that operates as one of the nation's largest drug-store chains in the United States.

103. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a nationally recognized and trusted brand.

104. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

105. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

106. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that that it was a safe and conventional baby powder when in fact it was not because it has been shown to contain asbestos, a highly toxic carcinogen, and therefore poses a severe health risk to consumers.

107. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

108. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the

undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to notify its customers that if they still possess the Product, they should immediately discard it, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: September 2, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com

Joel Oster
Of Counsel
Law Offices of Howard W. Rubenstein
22052 W 66th St #192
Shawnee KS 66226
Tel: (913) 206-7575
joel@joelosterlaw.com
*Pro Hac Vice* Application to be Filed